Gary ROSE, Plaintiff

v.

HOME DEPOT U.S.A., INC., Defendant

No. CIV. AMD 01–229.

United States District Court,
D. Maryland.

Feb. 26, 2002.

Mary Ann Ryan, Laurel, MD, for Plaintiff.

Robert L. Duston, Schmeltzer Aptaker and Shepard PC, Washington, DC, for Defendant.

## MEMORANDUM

DAVIS, District Judge.

Plaintiff, Gary Rose, brought this one-count action for compensatory and punitive damages against his former employer, Home Depot U.S.A., Inc., pursuant to the American with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, in the Circuit Court for Anne Arundel County, from which the case was timely removed by defendant to this court in accordance with 28 U.S.C. § 1441. Rose alleges that defendant violated the ADA by failing to accommodate a disability, namely, vasomotor rhinitis. Discovery has been completed and now pending, *inter alia*, is defendant's motion for summary judgment. The issues have been fully briefed, and no hearing is necessary. For the reasons set for below, I shall grant defendant's motion for summary judgment.

### I.

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indust. Co v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987).

## II.

An understanding of the proper legal outcome in this case requires the recitation of the detailed factual background out of which this case arises. Of course, the evidence must be viewed (and is recounted herein) in the light most favorable to Rose.

### Rose's Early Employment with Home Depot

Rose was hired by Home Depot in January 1995 to work at the Special Services Desk. He was trained at the Home Depot

in Oxon Hill, Maryland. *Dep. of Gary Rose, October 9, 2001* at 45 (hereinafter *Rose Dep.*). Sometime within his first year at Home Depot, Rose transferred to the Millwork Department, which handles special ordering and installation of such products as windows, doors, siding, and shingles. *Id.* at 45–46. At that time, the Assistant Store Manager for the Millwork and Lumber Departments was Mark Edwards. *Edwards Decl.* ¶ 2. About a year after starting in the Millwork Department (early 1997), Rose became the Department Supervisor. *Rose Dep.* at 46.

Sometime around May 1998, Rose contacted Edwards, who had transferred to the Glen Burnie, Maryland, store in February 1997. *Rose Dep.* at 39–40; *Edwards Decl.* ¶¶ 2, 5. Rose asked Edwards to help Rose arrange a transfer from the Oxon Hill store to the Glen Burnie store. *Rose Dep.* at 39–40. Rose knew that such a transfer would result in his removal from a supervisory position, but Rose decided that he did not wish to remain as a Supervisor because it was too stressful. *Id.* at 47–48. Edwards contacted the Store Manager of the Glen Burnie store, who in turn spoke with the Store Manager at Oxon Hill, and Rose was permitted to transfer. *Id.* at 39–40, 51–52; *Edwards Decl.* ¶¶ 5–7.

Ordinarily, when an employee desires to transfer, he must contact either his current store manager or the Human Resources Manager. *Edwards Decl.* ¶ 6. An employee who wishes to transfer requires the approval of both his current Store Manager and the Store Manager at the new store. Once an employee asks for a transfer, the decision regarding whether a transfer is possible, and the initiation of the transfer process, are functions shared by the Store Managers of the two stores involved. The Store Manager at the employee's current store and the Store Manager at the transfer store communicate

with each other to determine if the transfer is possible. Whether a transfer is possible is largely dependent on whether the Store Manager of the transfer store has work available for the employee seeking transfer. If both Store Managers agree to the transfer, the current Store Manager completes a form approving the transfer. The form is then sent to the transfer store. *Id.* Rose was aware that he did not follow the ordinary method of arranging a transfer in respect to his 1998 transfer from Oxon Hill to Glen Burnie. *Rose Dep.* at 51–52.

Rose worked at the Glen Burnie store from June 1, 1998, until July 26, 1999, when he began an extended leave of absence, as discussed *infra.* He alternated between the Lumber Department and the Millwork Department, two sister departments that were both overseen by Edwards. *Id.* at 56.

### Rose's Ailments

Rose had begun to suffer from headaches and sinus infections in 1994. *Rose Aff.* ¶ 7. His physician, Dr. David Boetcher, referred Rose to a neurologist, Dr. Jerold Mikszewski. In September 1994, Rose told Dr. Mikszewski that he had suffered severe headaches two or three times per year that had been relieved with sleep and aspirin, but on this occasion his headache had lasted two weeks. *Def.'s Ex.* 6, at 1 (Medical Records of Dr. Jerold Mikszewski). Dr. Mikszewski tentatively diagnosed sinusitis, and a CT Scan indicated possible chronic sinusitis. *Id.* at 1–2. Rose was treated with several antibiotics, an antidepressant, Zoloft, and Tylenol. *Id.* at 1. Rose had several follow-up appointments with Dr. Mikszewski. Dr. Mikszewski's notes, dated October 3, 1994, indicate that Rose stated that his headaches came and went. Also, it appeared to Dr. Mikszewski that as Rose's stress increased so did his headaches. *Id.* at 3. During another visit (possibly October 18, 1994), Rose reported that he had had no headaches since his last visit, and the doctor noted that, since Rose started to take the medication prescribed to him, he had not had a headache. *Id.* at 4. During his visit on December 19, 1994, Rose related to Dr. Mikszewski that he had had a couple of minor headaches and one major headache since his last visit. *Id.* at 5. Dr. Mikszewski described these headaches as migraine headaches. *Id.* Rose did not continue to see Dr. Mikszewski because the doctor gave him a medication that needed to be injected, and Rose felt that he could not inject himself. *Rose Dep.* at 16–17; *Baker Dep.* at 37.

Between January 1995 and July 1999, Rose saw his family physician for his headaches and sinus problems. *Rose Dep.* at 17–18. Rose testified that it was not until 1996 that he began to suffer from headaches similar to the ones from which he presently suffers. *Id.* at 16. On May 22, 1996, Rose was diagnosed with bronchitis and sinusitis, and was given antibiotics and samples of Claritin D. *Def.'s Ex.* 5, at 7 (Medical Notes of Dr. David Boetcher, Dr. Katherine David, and Dr. Steven Schwartz). In September 1996, Rose suffered again from sinusitis and was given Claritin D and Vancenase (a cortisone nasal spray). *Id.* at 8. The record does not show that Rose suffered from sinus problems in 1997. Throughout 1998, Rose suffered from osteoarthritis and gastrointestinal problems that led to gallbladder surgery. *Id.* at 10–16. In April 1998, Rose was referred to Dr. David Borenstein, complaining of pain in his knees and elbows that had gone on for two years. *Def.'s Ex.* 8. According to the medical history taken by Dr. Borenstein, Rose reported having a history of occasional migraine headaches. *Id.* at 2.

Rose testified that his family physician began treating him for sinusitis in 1996.

Rose Dep. at 17. He would suffer from congestion and headaches and would take over-the-counter sinus medications until he became infected and had to see his doctor to receive antibiotics. *Id.* at 18. According to Rose, in his perception, this would happen about 10 or 12 times a year. *Id.* at 19. Rose further stated that from 1996 through 1999, the sinus infections became increasingly worse. *Id.* at 20. He fought the sinus infections with both over-the-counter medications and then antibiotics. *Id.* at 21. The antibiotics would clear up the congestion, but the headaches would continue on a periodic basis (once or twice a month), for which he would use Tylenol, but mostly Advil (up to 12 tablets a day when the headache was at its fullest). *Id.* at 21–22. According to Rose's wife, Shirley Baker, it would take seven to ten days for the antibiotics to take effect. *Baker Dep.* at 85. Despite these circumstances, Rose rarely missed work; he would be absent at most a few days. *Id.* at 44–48; *Rose Dep.* at 129. The record does not demonstrate that Rose sought any consultations with his family physician for sinusitis or headaches between September 1996 and January 1999. *Def.'s Ex.* 5, at 7–17.

On January 20, 1999, Rose visited the office of his family physician and consulted with Dr. Schwartz, who had joined Dr. Boetcher's practice in 1997. *Id.* at 17. Rose related to Dr. Schwartz that he had been suffering from sinus pressure and a headache behind the eyes for a few days. *Schwartz Dep.* at 14. Dr. Schwartz diagnosed him with sinusitis based, in part, on Rose's sinus pressure and Dr. Schwartz's recollection of Rose's suffering from chronic sinusitis. *Id.* at 15. Dr. Schwartz prescribed an antibiotic, a cortisone-type nasal spray, and a decongestant nasal spray. *Id.* at 15–16. Rose testified that he used the medicine that Dr. Schwartz prescribed as the prescription indicated. *Schwartz Dep.* at 68–70. Rose did not receive any medical treatment for sinus problems or

headaches between January 1999 and July 1999. *Def.'s Ex.* 5, at 17–18.

### The Exacerbation of Rose's Symptoms in July 1999

Twice each year, in January and July, in preparation for Home Depot's semi-annual inventory, one employee from each department is asked to work an overnight shift. *Edwards Decl.* ¶ 12. This assignment is temporary and usually lasts about four weeks. Employees are typically scheduled from 11 p.m. until 5 or 6 a.m. *Rose Dep.* at 58. Rose voluntarily undertook this assignment while he worked for Mark Edwards in Oxon Hill. *Edwards Decl.* ¶ 12; *Baker Dep.* at 53. Rose's first night of inventory preparation in the Glen Burnie store was in January 1999. *Def.'s Ex.* 36. According to his time sheets, he worked from 8:00 p.m. until 5:00 a.m. from January 11, 1999, through January 28, 1999. *Id.* As noted *supra,* Rose visited his doctor complaining of sinus problems during this time period on January 20, 1999.

Rose participated in the second 1999 inventory at the Glen Burnie store beginning on Monday, July 5, 1999, from about 7:00 or 8:00/8:30 p.m. until 5:00/5:30 a.m. *Id.* The job required Rose to work in a warehouse atop a 16–foot ladder checking merchandise. *Rose Dep.* at 58. There was a lot of dust and dirt on the merchandise and in the rafters, and these substances would inevitably end up on Rose in the course of the shift. *Id.* Further, there was little or no fresh air; Rose described the warehouse as "[h]otter than blazes," in part, because he had to work close to the lights, atop a ladder, with a good number of other employees. *Id.* at 61. Rose complained about the poor air quality and circulation in the store overnight and was told that nothing could be done. *Id.* at 58–61.

During the July 1999 inventory, Rose suffered from very bad headaches and si-

nus problems. *Id.* at 62. According to his wife, Baker, Rose was having excruciating headaches. *Baker Dep.* at 55. She tried to get Rose to see Dr. Boetcher and she made an appointment with an allergist. *Id.* at 54–56. The headaches had "been going on for about a week, maybe a week and a half" before Rose saw the allergist. *Rose Dep.* at 63. Rose worked a full overnight shift on Monday, July 12, 1999, but he did not work the rest of the week. *Def.'s Ex.* 36. The following week he worked four days, from Tuesday, July 20 until Friday, July 23, from about 5:00 a.m. until 2:00 p.m. *Id.*

Rose testified that sometime between the time he met with the allergist on July 21 and the time he saw Dr. Schwartz on July 30, he told his department supervisors that he needed to resume working the day shift:

Q: Tell me whatever you can recall about those conversations?

A: I was, you know, because of the problems and the dust and the humidity in here at night I'm not able to do overnight inventory even though I had done it for four years straight twice a year, that they needed to put me back into days or find somebody else to do it.

*Id.* at 89–90. He also told Edwards that he could not handle the heat, dust, and fumes. *Id.* at 90. According to Rose, the managers' response was that they would look into it. *Id.* at 91. At that point, Rose still had three weeks remaining on the inventory shift. *Id.* Rose's last day at work was Friday, July 23, 1999. *Def.'s Ex.* 36.

On Monday, July 19, 1999, Rose had a scheduled appointment with Dr. Schwartz. *Def.'s Ex.* 5, at 18. Dr. Schwartz was running late, however, and so Rose left the office around 3:30 p.m. with the intention to return "shortly." *Id.* Rose returned at 4:31 p.m. but Dr. Schwartz had not yet arrived. *Id.* The staff informed Rose that he would have to reschedule his appointment, but when he was unable to get the first appointment for the following day, Rose declined to make an appointment, stating that he would go elsewhere. *Id.* Rose's wife called Dr. Schwartz's office the next day, July 20, 1999, and demanded that Rose be put on antibiotics for his sinus problems. *Id.* It appears from the medical chart that the prescriptions were called in to Rose's pharmacy on or about July 23, 1999.

As Rose was unable to get an appointment with Dr. Schwartz, his wife made an appointment for Rose with Dr. Jyothi Gadde, *Baker Dep.* at 56, who is board certified in Internal Medicine and Allergy Immunology. *Def.'s Ex.* 12; *Gadde Dep.* at 7. At his Wednesday, July 21, 1999, visit, Rose told Dr. Gadde that he had recurring sinus infections for five years, and that it was primarily a spring problem with no symptoms in the fall. *Id.* at 10–14. Rose did not indicate that he had problems other than during the spring and when they occurred they only lasted for a few weeks. *Id.* at 18. Rose further related to Dr. Gadde that his current symptoms had lasted approximately four weeks and that his symptoms included headaches, nasal congestion, some nasal discharge, some chest congestion, and some coughing. *Id.* at 14–15. Rose denied having any chest symptoms, including shortness of breadth, chest tightness, and wheezing. *Id.* at 16; *Def.'s Ex.* 13, at 1.

Dr. Gadde also took a social history (labeled environmental history in Rose's medical records). *Gadde Dep.* at 17; *Def.'s Ex.* 13. According to Dr. Gadde, Rose did not mention his working conditions at Home Depot or that these conditions had been bothering him. *Gadde Dep.* at 17–18; *Def.'s Ex.* 13. Also, he did not indicate any sleeping difficulties. *Gadde Dep.* at 18; *Def.'s Ex.* 13. Dr. Gadde

conducted a breathing test to rule out asthma. *Gadde Dep.* at 19. The result of the test was normal, particularly as Rose is a smoker. *Id.* at 19–20. Dr. Gadde conducted standard allergy skin testing and concluded that Rose was not having allergic reactions. *Id.* at 22; 25–28.

Dr. Gadde concluded that Rose's immediate symptoms indicated a sinus infection requiring antibiotics. *Id.* at 23, 40; *Def.'s Ex.* 13, at 2. She described his symptoms as mild to moderate. *Gadde Dep.* at 40. She further noted that upper respiratory infection or non-allergic rhinitis due to non-specific irritants was probably precipitating his symptoms. *Def.'s Ex.* 13 at 2. She prescribed antibiotics, told Rose to stop smoking and instructed him to return for a second visit in four weeks. *Id.; Rose Dep.* at 71–72. She also provided Rose a one-page description of vasomotor rhinitis (a form of nonallergic rhinitis). *Rose Dep.* at 65, 71–72; *Def.'s Ex.* 14 (Vasomotor Rhinitis Informational Sheet). It is unclear whether Rose filled the prescriptions given to him by Dr. Gadde. *Baker Dep.* at 62; *Def.'s Ex.* 37 (Prescription Pharmacy Log). It is undisputed that Rose did not return to see Dr. Gadde as she had instructed him. *Gadde Dep.* at 62.

On July 23, 1999, Rose filled the prescription for antibiotics prescribed by Dr. Boetcher. *Baker Dep.* at 62. On July 28, 1999, Rose states that he called the computer room at the Glen Burnie store regarding a medical leave of absence.[1] *Def.'s Ex.* 15, at 1 (Rose's Call Log). Later that same day, Rose also called the phone center at the store to report that he would be out of work until Friday, July 30, 1999. *Id.* On Friday, July 30, 1999, Rose

went to see Dr. Schwartz. *Def's Ex.* 5, at 19.

Rose told Dr. Schwartz that he had seen Dr. Gadde and reported that he did not have allergies. *Id.* Rose stated that Dr. Gadde had diagnosed him with "vasomotor rhinitis," but he did not report to Dr. Schwartz Dr. Gadde's treatment plan. *Id.* Rose also reported that he had been suffering from headaches for six weeks but that his sinuses were improving. *Schwartz Dep.* at 23. According to Rose, his headaches were worse when he went outside but got better when he went to the mountains at his family home in Maysville, West Virginia. *Id.* His headaches were severe, and he was unable to sleep, work, and concentrate. *Id.* at 24. Dr. Schwartz diagnosed Rose with chronic sinusitis, sinus headache, and disabling headache and prescribed a decongestant *Id.* According to Rose, he stated to Dr. Schwartz:

> ... I couldn't stand this any longer, I said I'm not able to function like this and our conversation went from there and I asked about getting some time off so I could go to the mountains and see if I can get this stuff to clear up. So, he gave me a 30 day supply of nose spray, some antibiotics and a disability chit [ (disability certificate) ] for work.

*Rose Dep.* at 77.

As the problem had continued throughout the summer, Dr. Schwartz suggested that Rose stop working until the heat broke (approximately four weeks), go to the mountains, and see an ear, noise, and throat ("ENT") specialist. *Schwartz Dep.* at 24. According to Dr. Schwartz, Rose

---

**1.** The call log prepared by Rose was not prepared contemporaneously with those calls. It was prepared by Rose and his wife in September 2000 (after he had filed his discrimination charge with the Equal Employment Opportunity Commission), in anticipation of litigation, allegedly based upon various notes that have

not been produced in discovery. *Rose Dep.* at 80–82; *Baker Dep.* at 81–83. Rose testified that he started keeping those detailed notes of every call in August 1999. *Rose Dep.* at 82–83. For purposes of this motion, defendant properly assumes that a jury would credit his recollection.

refused the referral for a consultation with an ENT as he had previously seen an ENT and found that the visit was not helpful. *Id.* Rose testified that he had seen an ENT in the late 70's or early 80's for nosebleeds. *Rose Dep.* at 123; *Baker Dep.* at 58–59. On deposition, Dr. Schwartz remarked that the diagnosis of vasomotor rhinitis "fit," and the fact that Rose reported relief of his symptoms when changing altitude, humidity level, and/or barometric pressure supports a diagnosis of vasomotor rhinitis. *Schwartz Dep.* at 31. In any event, Rose apparently relocated to West Virginia at around the time he visited Dr. Schwartz.

### Vasomotor Rhinitis

Rhinitis refers to the inflammation of the membranes lining the nose. *Gadde Dep.* at 34. It is characterized by nasal congestion, rhinorrhea, sneezing, itching of the nose and/or postnasal drainage. Dikewicz and Fineman, *Executive Summary of Joint Task Force Practice Parameters on Diagnosis and Management of Rhinitis,* at 1 (Ex. 31) (1998)[2] (hereinafter *Executive Summary* ); *Gadde Dep.* at 34. According to Dr. Gadde, 15% to 20% of adults are affected by rhinitis. *Id.* The most common form of rhinitis is allergic rhinitis. *Id.* at 35; *Executive Summary* at 2.

There are several forms of nonallergic rhinitis. Many viruses, such as the common cold virus, can cause rhinitis; this is referred to as infectious rhinitis. *Gadde Dep.* at 36; *Executive Summary* at 2. Some women develop rhinitis during pregnancy. *Executive Summary* at 7. Some people develop symptoms when they eat particular foods, while others may develop the condition due to the use of cocaine, overuse of nasal decongestants, or airborne substances in the workplace. *Id.* at 2–3. When it can be determined that a person suffers symptoms only when exposed to certain substances in the workplace, such as grain, wood dusts, and chemicals, then the diagnosis is occupational rhinitis, which may be either allergic or nonallergic.[3] *Id.* at 3.

Vasomotor rhinitis is typically a catchall diagnosis when allergic and other types of rhinitis are ruled out. *Gadde Dep.* at 40. According to Dr. Gadde, she ordinarily informs her patients that her initial diagnosis is preliminary and that further evaluation is required to rule out other types of rhinitis—something she was unable to ac-

---

**2.** The Executive Summary

reviews key points about diagnosis and management of rhinitis contained in the comprehensive document, *Diagnosis and Management of Rhinitis: Complete Guidelines of Joint Task Force on Practice Parameters in Allergy, Asthma and Immunology,* and *Joint Task Force Algorithm and Annotations for Diagnosis and Management of Rhinitis.* These documents represent a consensus opinion of the Joint Task Force on Practice Parameters in Allergy, Asthma and Immunology, a national panel co-sponsored by the American Academy of Allergy, Asthma and Immunology, the American College of Allergy, Asthma and Immunology, and the Joint Council on Allergy, Asthma and Immunology.

Dikewicz and Fineman, *Executive Summary of Joint Task Force Practice Parameters on* *Diagnosis and Management of Rhinitis* at 1 (Ex. 31), *available at* h ttp://www.medscape.com/other/ guidelines/icaai.dyke.pntjcaai.dyke.html. This Report is considered the current consensus medical opinion "at least on definitions and differential diagnosis." *Gadde Dep.* at 33.

**3.** An allergy is defined as a person's production of $I_GE$ anti-bodies to a protein-based substance. A person may develop rhinitis in response to an adverse reaction to tobacco smoke, perfume or other irritants, but an allergist will still classify that as non-allergic rhinitis because those substances are not proteins, and thus would not show up on an allergy test. Wood dust is an irritant, while an allergy to dust mites is protein based and thus would show on an allergy test. *Gadde Dep.* at 29–32.

complish with Rose. *Gadde Dep.* at 36–39; 42–43. With Rose, the following occurred:

Q: Well, I think, first of all, with one office visit of mine that I had seen him, it is only a part of the differential diagnosis that this is vasomotor rhinitis, and that was my preliminary assessment of this patient in one office visit. And when people have a possibility of that, then I provide some information [ (referring to the pamphlet on vasomotor rhinitis that Dr. Gadde gave to Rose) ] so they can read about it, either if they ask for it or even without asking for it.

Q: And would it be a customary part of your discussion of the treatment plan and diagnosis to explain that this was preliminary and that further evaluation was needed after the sinus infection was under control?

A: That's correct.

Q: Although you have no recollection of actually discussing that with Mr. Rose, that would have been a— it's part of your usual and customary practice?

A: That's a standard practice. And by just providing some of the information does not necessarily mean at one visit that I have made this as a diagnosis.

*Id.* at 42–43.

It is sometimes possible to identify the irritants that tend to trigger rhinitis symptoms in a person who has vasomotor rhinitis. According to Dr. Gadde, those with vasomotor rhinitis tend to respond to a wide range of factors. *Id.* at 41. Such factors include exposure to cold air, changes in temperature, changes in barometric pressure, and stress. *Def.'s Ex.* 14. Dr. Gadde further asserts that the most important factor is whether the patient smokes, as smoking "is the primary precipitant of this condition and primary aggravator of this condition." *Gadde Dep.* at 41. Accordingly, Dr. Gadde "strongly recommended" that Rose refrain from smoking as it was the "most important" thing

he could have done to help to relieve his symptoms. *Id.*

Nasal steroid medications, antihistamines, and decongestants are used to control the symptoms of vasomotor rhinitis. *Gadde Dep.* at 36; *Def.'s Ex.* 14. According to Dr. Gadde, these treatments are usually successful. *Gadde Dep.* at 44–46. If these treatments fail to provide relief, there are additional medical options, including cortisone pills and surgery. *Id.* at 59–54; *Def.'s Ex.* 14; *Schwartz Dep.* at 31–33. According to Dr. Gadde, if proper treatment regimes are followed, this condition will rarely interfere with a patient's lifestyle. *Gadde Dep.* 45, 56–57. Severe headaches are not a common symptom of this illness, except when a patient's sinus congestion turns into a sinus infection. *Gadde Dep.* at 64–65, 69–72.

### Rose's Unsuccessful Efforts to Obtain a Transfer after July 1999

The gravamen of Rose's claim in this case is that Home Depot intentionally discriminated against him in violation of the ADA by refusing to accommodate his alleged disability from vasomotor rhinitis. According to Rose, the reasonable accommodation he desired was a transfer to a Home Depot store in Winchester, Virginia, not far from his family home in Maysville, West Virginia. As the following factual account demonstrates, however, Home Depot can hardly be deemed to have *intentionally refused* to transfer Rose. To the contrary, even viewed in the light most favorable to Rose, the undisputed summary judgment record reflects an unfortunate series of miscommunications and misunderstandings, coupled with regrettable bureaucratic inattention to detail on the part of several Home Depot managers, as compounded by Rose's failure to approach the company and follow up those approaches (and in particular, in respect to his longtime advocate in the company,

Mark Edwards) with clarity and coherence as to his wishes. Rose's conclusory contention that a reasonable fact finder could reasonably conclude from the following series of events that Home Depot acted intentionally to deprive Rose of rights assured to him under the ADA is the product of an extraordinary stretch of logic and common sense.

On August 9, 1999, Mark Edwards called to find out why Rose had not been at work for two weeks. *Def.'s Ex.* 15, at 1. According to Rose's call log, no one at Home Depot had received the leave of absence documentation that had been faxed on July 30, 1999. *Id.* Rose told Edwards that he spoke to "Christy" in the computer room on July 28, 1999, about his absence. *Id.* He then assured Edwards that his wife would fax the appropriate documentation the next day. *Id.* Rose testified that he and Edwards did not discuss the possibility of a store transfer at that time. Rose states that, during August, he was not thinking of a transfer, but rather, simply of taking the month to recover. *Rose Dep.* at 77–78, 87–90.

Rose remained in West Virginia until shortly before an August 27, 1999, appointment with Dr. Schwartz. *Id.* at 79. According to Rose the following discussion took place:

> I went in and talked to Dr. Schwartz. We went over it and he asked me how I was doing, how I was feeling. I told him I was doing fine. We discussed what we should do since the higher altitude seemed to be what I needed and at that time he recommended that I should move to a more mountainous climate, Colorado or the mountains of New Mexico, something like that. And I explained to him that's not an option, to drop my life, yank my wife out of her work and move.
>
> And from there he said, well, he could give me another 30 days. He would

write a letter to Home Depot, to Lori Bennett requesting a transfer to the Winchester store since it's at a higher altitude and I wouldn't be confined to being in the City 24 hours a day. And that was about it.

*Id.* at 79–80. According to Dr. Schwartz, he gave Rose a 30–day leave of absence on the assumption that Rose was going to attempt to arrange to be transferred. *Schwartz Dep.* at 42–43. Dr. Schwartz felt that the sinusitis had turned infectious, prescribed an antibiotic, and switched nasal sprays. *Id.* at 43. Dr. Schwartz gave Rose a doctor's note stating that Rose was totally incapacitated until September 30, 1999 for "disability headaches" and indicated that a full dictated letter was to follow. *Def.'s Ex.* 17 (Disability Certificate). Thereafter, in a letter dated September 1, 1999, addressed to Store Manager Lori Bennett, Dr. Schwartz stated that Rose had developed severe and disabling rhinitis and sinusitis symptoms; his problems were purely environmental due to the poor air quality in the local atmosphere; he had incapacitating headaches and so was unable to work; the solution was that Rose move to a more mountainous climate; and that Rose required a six week leave of absence to arrange a transfer. *Def.'s Ex.* 18.

Rose faxed the doctor's note to the Glen Burnie store on September 1, 1999. *Def.'s Ex.* 15, at 2. Before this, on August 31, 1999, according to Rose's call log, Rose called Home Depot and spoke to Assistant Manager Ted Neale and informed him of his situation. Rose told Neale that he was faxing the doctor's note and he asked Neale to forward the information to Mark Edwards and Lori Bennett. *Id.* That same day, Rose contacted Bennett and informed her that for medical reasons he needed to be transferred to the Winchester, Virginia, store, which is located near Maysville, West Virginia. He told Bennett

that Dr. Schwartz would be sending a letter. *Id.* Bennett asked how long Rose would be unable to work. *Id.* When Rose told her he could return the first week of October, Bennett allegedly said that she could not ask the Store Manager at the Winchester store to hold open a position for four weeks, and that Rose should call her back two weeks before he was ready to return to work. At that time she would begin the transfer process. *Id.; Rose Dep.* at 95–96.

Rose did not call Bennett on September 15, 1999, two weeks before the expiration of the second 30–day leave of absence. Rose did call on October 4, 1999. *Def.'s Ex.* 15, at 2. He spoke to Ted Neale and related to him that Bennett had told him to call regarding the transfer two weeks prior to returning to work; Neale said that he would give Bennett the message. *Id.* Meanwhile, Store Manager Bennett had been promoted, effective September 27, 1999, and she had been replaced by Assistant Store Manager Jay Faison. *Bennett Decl.* ¶ 5; *Faison Decl.* ¶ 4. Faison had started working at the Glen Burnie store on or about July 26, 1999; he had never met Rose. *Faison Decl.* ¶ 4–5.

At the time that she was promoted, Bennett had not seen Dr. Schwartz's September 1 letter and she does not recall having told Rose to contact her about a transfer. *Bennett Decl.* ¶ 14. Normally, the procedure regarding a transfer would be Bennett's contacting a Human Resource Manager for assistance with the situation as Home Depot's policies require. *Id.* ¶ 19. Assuming the conversation did take place as Rose reports, she did not discuss Rose's transfer request with Faison because, based upon her last conversation with Rose, he was to contact her again. *Id.* ¶ 14. Faison states that he was unaware of any transfer issue until February 2000. It came to his attention that Rose had been on a leave of absence since July 1999,

but had never completed the formal paperwork for a medical leave, and the "doctor's notes did not explain his absence for any period after early-October 1999." *Faison Decl.* ¶ 8. Around the same time, Faison received a call from the store manager of the Winchester Virginia store, who reported that Rose had appeared at the Winchester store to begin work, asserting that he had been transferred to that store. *Id.* ¶ 7. However, neither of the store managers had approved the transfer. *Id.*

According to Rose's call log, Rose called the Glen Burnie store on October 4, 1999, and spoke to Assistant Manager Ted Neale about how Rose was supposed to get in touch with Lori Bennett about his transfer. *Def's Ex.* 15, at 2. Neale promised to give the message to Bennet. *Id.* Thereafter, on October 18, 1999, Rose called the phone center and left a message for Bennett's assistant, and he also called and spoke with Ted Neale, who informed Rose that he would speak to the store manager and that someone would call Rose. *Id.* at 3.

According to Vanessa Wimer, Department Supervisor for Special Services from February 1999 through April 2000 at the Glen Burnie store (she was also acting as an administrative assistant to all of the managers), one of the assistant store managers (most likely Mark Edwards) "in early or mid-October 1999" asked her to send Rose's employee file to the Winchester store, as his transfer had been approved by Bennett. *Wimer Decl.* ¶ 3. Wimer had no direct knowledge as to the basis for this instruction. *Id.* Wimer prepared and signed a transfer form, without securing any other management signatures, and sent the form and Rose's file to the Winchester store on or about October 25, 1999. *Id.; Def.'s Ex.* 19.

On November 5, 1999, Rose called the Glen Burnie store and spoke to a new assistant store manager, "Sean." *Def.'s Ex.*

15, at 3. He explained to Sean that he was supposed to be transferred. Sean told Rose that Bennett had been promoted in September 1999, that he would check on Roses's transfer, and that he would get back to Rose. *Id.* Rose called again on November 9, 1999, and left a message with an unnamed assistant store manager. *Id.* Either before or after he made this call on November 9, 1999, Rose received a message on his answering machine to call Charlotte Perry at the Glen Burnie store regarding his transfer. *Id.*

Sometime in late December, Rose learned from Perry, a new Administrative Assistant Store Manager who exercised local responsibilities for human resource functions, that the transfer paperwork for Rose had been returned to the Glen Burnie store. *Rose Dep.* at 108; *Def.'s Ex.* 15, at 3; *see also Wimer Decl.* ¶ 4 (explaining that the paperwork had been sent to the Glen Burnie store sometime prior to April 2000). Rose asserts that Perry told him to find out why the papers were returned, *Rose Dep.* at 109, but the call log indicates that he offered to follow up. *Def.'s Ex.* 15, at 3. Rose spoke to an assistant store manager at the Winchester store on December 30, 1999 and was told that the manager was on vacation but would be asked why the papers had been returned to the Glen Burnie store. *Id.* On that same day, Rose had a similar conversation with Charlotte Perry at the Glen Burnie store, and she stated that when the Winchester manager returned, she too would figure out what was going on. *Id.* at 4. Rose testified that, on three occasions during late November and December 1999, he left voicemail messages for the Human Resources Manager. *Rose Dep.* at 86–87. These phone calls were not included in Rose's call log, submissions to the EEOC, or in his responses to interrogatories.

Rose visited the Winchester store on January 21, 2000, and left a message for the assistant manager and the manager. *Def.'s Ex.* 15, at 4. Rose then received a telephone call from Charlotte Perry, who stated that she did not yet know what was happening in regard to his transfer. *Id.* Rose also received a telephone call from the Winchester store during which he was told that he should contact the Glen Burnie store about the transfer. *Id.* On January 26, 2000, Rose called Charlotte Perry to tell her that the Winchester store did not know about his transfer, and Perry stated that she was only an assistant but that she would find out what was happening. *Id.* That same day, Rose's wife received a telephone call from Home Depot at their home in Greenbelt, Maryland, during which she was informed that Rose needed to go to the Glen Burnie store to fill out the leave of absence papers. Rose called Perry the next day. Perry told him that she did not know what happened to his original paperwork, but she would send his wife the forms to fill out. *Id.* at 5. According to Rose, the form was mailed without the complete address on it on February 4, 2000.

On February 5, 2000, Rose began a series of hospital and physician visits for what he first believed to be heart attack or stroke symptoms, which were later diagnosed as symptoms of "panic attacks." *Id.; Rose Dep.* at 35–36. Rose went through various medical consultations between February and April 2000, during which he was diagnosed with migraine headache, anxiety and fibromyalgia pain syndrome; he was referred to a psychiatrist. *Rose Dep.* at 5; *Def.'s Ex.* 21 (Dr. Luban Medical Records); *Def.'s Ex.* 22 (Dr. Thomas Medical Records).

On February 7, 2000, someone at the Glen Burnie store contacted Rose about the fact that Home Depot had yet to receive his leave of absence paperwork. *Def.'s Ex.* 15, at 5. Rose stated that he

would send it. On February 24, 2000, Rose received a letter from Faison that he had ten days to get his paperwork into the store or he would be terminated. *Id.* Faison readily concedes that he sent the letter to Rose to notify Rose that his employment would be terminated if the necessary leave of absence documentation was not received within ten days. *Faison Decl.* ¶ 9; *Def.'s Ex.* 23 (Letter from Jay Faison to Gary Rose, February 23, 2000). According to Faison, when the paperwork was received, Rose was continued on leave of absence status. *Faison Decl.* ¶ 9; *Def.'s Ex.* 20 (Leave of Absence Paperwork). However, the paperwork submitted by Rose only covered the period from August 1, 1999, through September 30, 1999. *Def.'s Ex.* 20.

### Rose's Contacts the EEOC and Learns the Concept of Disability Discrimination

Apparently as a result of the symptoms that appeared in early 2000, Rose is now unable to work at all. In any event, Rose contacted the EEOC on March 6, 2000. *Def.'s Ex.* 24 (EEOC Telephone Inquiry Form). Rose felt that he was being "screwed" by Home Depot and being "discriminated against" because he did not receive the transfer. *Rose Dep.* at 119–20. When he called the EEOC, they told him about disability discrimination. *Id.* at 120. Rose's EEOC charge, dated April 30, 2000, states:

I. I have been employed by the above named employer since January 7, 1995. My most recent position is Sales Representative. I have a disability within the meaning of the ADA and as such, I have been away from the job site since July 1999. On or about October 1999, I requested a reasonable accommodation.

II. I have not received any response from the company regarding this accommodation.

III. I believe that I have been discriminated against based on my disability, in violation of the American with Disabilities Act of 1990, as amended, with respect to reasonable accommodation.

*Def.'s Ex.* 26. In the affidavit Rose submitted to the EEOC, he attributed his 1999 symptoms to the conditions of working the night inventory shift:

Since the company has failed to accommodate me, I have been away from my job since late July 27, 1999. The previous evening I had been assigned to work overnight, in a locked store vault performing my duties. Because the store was closed and the circulation was shut off, I became ill and was subsequently hospitalized.

*Def's Ex.* 27 (EEOC Affidavit). There is no record of hospitalization however. Rose also stated in his EEOC intake form:

I am affected at all times, not only at work. When air conditioning has been turned off it makes the condition worse in causing excruciating headaches, nasal congestion, sinus infections and an inability to sleep. Life's normal functions are impaired.

*Def.'s Ex.* 25, at 4 (EEOC Intake Form).

On August 9, 2000, the EEOC issued its determination. The determination states:

Documentary and testimonial evidence revealed that [Rose] is a qualified individual with a disability. [Home Depot] in its position statement denied that [Rose] has a disability. It also contended that [Rose] failed to follow the company's policy in requesting a transfer. However, documentary evidence supports that [Rose] repeatedly requested a transfer to [Home Depot's] Winchester, Virginia, store in accordance with its policy. Evidence further revealed that [Home Depot] denied [Rose's] request and subsequently discharged him from his employment.

*Pl.'s Ex.* D. The determination further states that there is "reasonable cause" to believe that Home Depot discriminated against Rose by "denying him a reasonable accommodation for his disability." *Id.*

When Rose filed his Charge of Discrimination with the EEOC, the Employee Relations Specialist in the Home Depot Division Office in New Jersey, working together with an outside contractor, was involved in Home Depot's investigation and response to that charge. *Ippolito Decl.* ¶ 16. After Home Depot reconstructed the events leading up to Rose's EEOC charge, Home Depot contacted the Winchester store, and then decided to offer Rose a transfer to the Winchester store. *Id.* Rose declined the offer. *Id.* Home Depot also attempted to settle the charge with an offer of partial back pay. *Id.* Rose also declined this offer. *Id.; Rose Dep.* at 116–17. Rose has made no efforts to secure alternative employment since he left the Glen Burnie store on July 27, 1999, except for arranging one job interview, which never took place. *Rose Dep.* at 113–14; *Baker Dep.* at 100.

The EEOC gave Rose a right to sue letter. He then filed the present suit, claiming discrimination under the American with Disabilities Act. Rose was officially terminated from his job with Home Depot on July 28, 2000. *Pl.'s Ex.* E. However, Home Depot regards Rose as eligible for rehire. *Id.*

### III.

#### A.

The ADA requires covered entities, including private employers, to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose undue hardship." *Toyota Motor Mfg., Kentucky,*

*Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 689, 151 L.Ed.2d 615 (2002) (internal quotation marks omitted) (quoting 42 U.S.C. § 12112(b)(5)(A) (1994)). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* at 689 (internal quotation marks omitted) (quoting 42 U.S.C. § 12111(8)).

■ The prima facie case in a failure to accommodate case under the ADA requires the plaintiff to show "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position ...; and (4) that the [employer] refused to make such accommodations." *Rhoads v. Federal Deposit Ins.,* 257 F.3d 373, 387 n. 11 (4th Cir.2001) (alterations in original) (internal quotation marks omitted) (quoting *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 6 (2d Cir.1999)).

■ The question of whether a plaintiff is disabled under the ADA, "and therefore can bring a claim under the statute, is a question of law for the court, not a question of fact for the jury." *Hooven–Lewis v. Caldera,* 249 F.3d 259, 268 (4th Cir.2001) (Rehabilitation Act case); *see Poindexter v. Atchison, Topeka & Santa Fe Railway Co.,* 168 F.3d 1228, 1230 (10th Cir.1999) ("Thus, the Court in *Bragdon* makes clear that whether a claimed affliction constitutes an impairment under the ADA and whether the identified endeavor constitutes a major life activity are determinations of law for the court to decide." (citing *Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998))); *cf. Betts v. Rector and Visitors of University of*

*Virginia,* 113 F.Supp.2d 970, 982 (W.D.Va. 2000) (issue of disability under ADA is a question of law), *rev'd on other grounds,* 2001 WL 1023115, 18 Fed.Appx. 114 (4th Cir.2001)(unpublished). *But see Cohen v. Township of Cheltenham,* 174 F.Supp.2d 307, 326 n. 16 (E.D.Pa.2001) ("Courts in this circuit have treated the issue of disability in cases under the ADA as an issue of fact."). In the absence of proof of how an individual is substantially limited in performing a major life activity by his or her alleged impairment, and to what degree, it is appropriate to dismiss the claim as a matter of law. *EEOC v. Sara Lee Corp.,* 237 F.3d 349, 352–53 (4th Cir.2001).

The ADA defines "disability" as a "(A) physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Rose contends that his claim falls under subsection (A). In determining whether Rose suffered from a disability, the court is required to explore whether Rose was "disabled" within the meaning of the ADA at that point in time where he requested an accommodation and adverse action (in the form of a denial) was taken. *Williams,* at 691 (citing 42 U.S.C. § 12102(2)(A)); *Pollard v. High's of Baltimore,* Inc., 281 F.3d 462, ——, Slip. Op. at 5 (4th Cir.2002); *Frazier v. Simmons,* 254 F.3d 1247, 1256 (10th Cir.2001); *Dubois v. Alderson–Broaddus College,* 950 F.Supp. 754, 758 (N.D.W.Va.1997). Thus, Rose does not dispute defendant's contention that the time period at issue begins on or about October 4, 1999, the date on which Rose called Lori Bennett regarding the transfer (as requested by Bennett). *See*

*supra.* Rose also does not dispute defendant's argument, and thus it is conceded, that Rose was no longer a "qualified individual" under the ADA as of February 5, 2000 (the date which Rose claims he became unable to work due to alleged emotional distress), and as such, he was no longer protected by the ADA.[4] *See Griffith v. Wal–Mart Stores, Inc.,* 135 F.3d 376, 380 (6th Cir.1998), *cert. denied,* 526 U.S. 1144, 119 S.Ct. 2018, 143 L.Ed.2d 1030 (1999). Therefore, Rose's repeated references to his current psychological problems are not relevant to Rose's burden to show that he had a disability that defendant failed to accommodate. *See Mem. of Law in Support of Pl.'s Opp. to the Def.'s Mot. for Summ. J.* at 3, 7 (hereinafter *Rose's Opp.*).

Rose contends that he had a physical impairment, vasomotor rhinitis, that substantially limited one or more major life activities. *Compl.* ¶ 3, *Def.'s Ex.* 29; *Def.'s Ex.* 25, at 4. Defendant assumes, for the purposes of this motion, that rhinitis (including vasomotor rhinitis) is a physiological disorder or condition affecting the respiratory system and thus qualifies as a physical impairment. *See Williams,* at 690 (quoting 45 C.F.R. § 84.3(j)(2)(I) (2001); 20 C.F.R. § 1630.2(h)(1)) (stating that the "physical or mental impairment" component of the definition of disability means, in part, "[a]ny physiological disorder, or condition . . . affecting one or more of the following body systems: . . . respiratory . . ."). However, defendant has not conceded that Rose actually suffers from the physical impairment of vasomotor rhinitis.

It appears that Rose argues not only that his disability is vasomotor rhinitis, but

---

**4.** A qualified individual with a disability means "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m).

also that his disability takes the form of the manifestations of his illness—episodic sinus infections, congestion, and headaches. *Rose's Opp.* at 5. Rose correctly concedes, therefore, that he must demonstrate that these manifestations substantially affect a major life activity. *Id.* ("If a plaintiff has an underlying disability which has characteristic manifestations, the plaintiff must still show that the characteristic manifestations substantially affect one or more major life activities .... Here, Mr. Rose has met that burden ...." (citing *Sara Lee Corp.* 237 F.3d 349)); *see Sara Lee Corp.* 237 F.3d at 352 ("An intermittent manifestation of a disease must be judged the same way as all other potential disabilities. That [ADA] statute is explicit-to be disabled under the ADA, a person must have a substantial limitation on a major life activity.").

According to the EEOC's interpretative regulations, "[m]ajor life activities [,under subsection (A) of the definition of disability of the ADA,] means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(I); *see also Williams*, at 690. Rose's complaint does not disclose which major life activities were allegedly substantially limited by his impairment. *Compl.* ¶ 4; *Def.'s Ex.* 29. However, in his memorandum opposing the motion for summary judgment, Rose contends that his physical impairment has affected his ability to work and to sleep, and to a lesser degree, to breathe. *Rose's Opp.* at 8.

The EEOC describes "substantially limits" as follows:

(1) The term substantially limits means:

(i) Unable to perform a major life activity that the average person in the general populations can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

(2) The following factors should be considered in determining whether an individual is substantially limited in a major life activity:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j); *see Williams*, at 690 (providing the same); *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 199 & n. 11 (4th Cir.1997) (noting that courts and the EEOC have similarly defined the term "substantially limits" (citing 29 C.F.R. § 1630.2(j)(1))).[5]

---

5. The Supreme Court has recently reiterated that "[t]he persuasive authority of the EEOC regulations is less clear" than that of the regulations interpreting the Rehabilitation Act (29 U.S.C. § 706(8)(B)), the precursor to the ADA. *Toyota Motor Mfg., Kentucky Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 689–90, 151 L.Ed.2d 615 (2002). The Supreme Court explained:

As we have previously noted, see *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 479, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), no

agency has been given the authority to issue regulations interpreting the term 'disability' in the ADA. Nonetheless, the EEOC has done so. *See* 29 C.F.R. §§ 1630.2(g)-(j) (2001). Because both parties accept the EEOC regulations as reasonable, we assume without deciding that they are, and we have no occasion to decide what level of deference, if any, they are due.

*Williams*, at 690; *see Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 199 n. 12 (4 Cir.1997) ("The EEOC interpretive guidelines are not controlling upon the courts by reason of their

The Fourth Circuit has further explained that "based on the aforementioned factors, it is evident that the term 'disability' does not include *temporary* medical conditions . . ., even if those conditions require *extended leaves of absence* from work." *Halperin*, 128 F.3d at 199 (emphasis added) (citations omitted); *see Pollard*, 281 F.3d at ——, Slip Op. at 6–7; 29 C.F.R. pt. 1630, app. at 339 (noting that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities"). Therefore, some impairments that are limiting, but are only "temporary," are not covered.

The Supreme Court has reasoned that the term "substantially limits" must be interpreted strictly "to create a demanding standard for qualifying as disabled." *Williams*, at 690. The Court stated:

> "Substantially" in the phrase "substantially limits" suggests "considerable" or "to a large degree." *See Webster's Third International Dictionary* 2280 (1976) (defining "substantially" as "in a substantial manner" and "substantial" as "considerable in amount, value, or worth" and "being that specified to a large degree or in the main"); *see also* 17 *Oxford English Dictionary* 66–67 (2d ed.1989) ("substantial": "relating to or proceeding from the essence of a thing; essential"; "of ample or considerable amount, quantity, or dimensions"). The word "substantial" thus clearly precludes impairments that interfere in only a *minor way* with the performance of [a major life activity] . . . .

*Id.* at 691 (emphasis added). The term "major life activity" should be equally

strictly construed. *Id.* at 691. The Supreme Court defined the term as such: "Major" in the phrase "major life activities" means important. *See Webster's, supra*, at 1363 (defining "major" as "greater in dignity, rank, importance, or interest"). "Major life activities" thus refers to those activities that are of central importance to daily life.

*Id.* at 691.

The Court has noted that these terms must be construed strictly because it is clear that the ADA is not intended to cover all those with disabilities. *Id.* at 691. For instance, the Supreme Court has determined that "the ADA's coverage is restricted to only those whose impairments are not mitigated by corrective measures." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 487, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Williams*, at 691. Thus, one has a disability under subsection A of the ADA definition of disability, *supra*,

> if, notwithstanding the use of a corrective device, that individual is substantially limited in a major life activity. . . . The use or nonuse of a corrective device does not determine whether an individual is disabled; that determination depends on whether the limitations an individual with an impairment *actually* faces are in fact substantially limiting.

*Id.* at 488, 119 S.Ct. 2139.

The Fourth Circuit has elaborated on this notion that not all those with a physical impairment are covered by the ADA. It stated that the ADA is designed to

> "assure[ ] that truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps." . . . Extending the

authority. . . . Nevertheless, where consistent with the ADA, they do not constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." (citations omitted)). Neither party

in the present case questions the reasonableness of the EEOC interpretive regulations. *See Pollard v. High's of Baltimore, Inc.*, 281 F.3d ——, —— n. 3, Slip Op. at 10 n. 3 (4th Cir.2002).

statutory protections available under the ADA to individuals with broken bones, sprained joints, sore muscles, infectious diseases, or other ailments that temporarily limit an individual's ability to work would trivialize this lofty objective.

*Halperin,* 128 F.3d at 200 (first alteration in original) (citation omitted); *see also Pollard,* 281 F.3d at ——, Slip Op. at 12. This concept includes those with lifetime impairments with intermittent manifestations that flare up. As stated, *supra,* the plaintiff is still required to demonstrate that the intermittent manifestations substantially limit a major life activity. *Sara Lee Corp.,* 237 F.3d at 352; *Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 16 (1st Cir.1997) (determining that acute episodic depression that has resulted in a five week absence and four months of work restrictions was not substantially limiting even if the underlying condition will be life long).

■ The Supreme Court in *Williams* ultimately held:

to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term.

*Williams,* at 692 (citing 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii)). Moreover, plaintiffs must provide more than evidence of a medical diagnosis of an impairment to prove a disability. *Id.* at 692. Rather, "claiming the Act's protection ... to prove a disability by offering evidence that the extent of the limitation caused by their impairment in terms of their own experience ... is substantial." *Id.* (internal quotation marks omitted) (alterations in original) (quoting *Albertson's Inc. v. Kirkingburg,* 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999)). The existence of

a disability is to be determined on a case-by-case basis. *Id.* at 692 (citing 42 U.S.C. § 12102(2); *Sutton,* 527 U.S. at 483, 119 S.Ct. 2139; *Albertson's Inc.,* 527 U.S. at 566, 119 S.Ct. 2162); *Pollard,* 281 F.3d at ——, Slip Op. at 7.

B.

Application of the above principles to the summary judgment record here compels the conclusion that Home Depot is entitled to judgment as a matter of law.

■ Home Depot first argues that Rose cannot establish that he was substantially limited in any of his major life activities— breathing, sleeping, and working. Specifically, defendant argues that Rose has failed to demonstrate that the episodic manifestations of his alleged medical impairment were not of sufficient intensity, frequency, and duration that they substantially limited his breathing, sleeping, and/or working. Defendant does not dispute that breathing, sleeping, and working qualify as major life activities. Defendant further argues that as Rose cannot demonstrate that all of his episodes of headaches, congestion, and sinus infections are characteristic manifestations of vasomotor rhinitis, Rose cannot demonstrate the efficacy or inefficacy of any mitigating measures that are available and cannot prove that his impairment was not simply a series of temporary and transitory conditions. Essentially, in a back-handed fashion, defendant is arguing that it is unclear whether Rose suffers from the physical impairment of vasomotor rhinitis.

In a case similar to this one, *Tangires v. The Johns Hopkins Hospital,* 79 F.Supp.2d 587 (D.Md.2000), *aff'd,* 230 F.3d 1354 (4th Cir.2000), the plaintiff alleged that she had asthma, that her asthma substantially limited major life activities, and that defendant failed to accommodate her condition with either changes in her workplace or a medical leave of absence. The

defendant contended that the plaintiff's asthma did not constitute a physical impairment within the meaning of the ADA and did not substantially limit her major life activities. *Id.* at 594. Judge Harvey first noted that asthmatic symptoms can almost always be controlled. *Id.* at 595. The court then determined that the medical evidence in the record established that asthma is readily treatable by two types of medication, brochialdialators and corticosteroids (anti-inflammatory medications). *Id.* Plaintiff was resistant to the use of inhaled steroids, and one of her doctors testified that he "had a difficult time treating plaintiff's asthma because of her reluctance to take steroid drugs and her refusal to comply with recommendations." *Id.* The court also noted that "[d]ifficulties in controlling plaintiff's asthma also arose because plaintiff persistently fragmented her medical care by seeking treatment from so many different doctors and in various emergency rooms of different hospitals." *Id.*

The court concluded that, based on the record, plaintiff's asthma was treatable and "that during her employment she intentionally failed to follow her physicians' recommendations that she take steroid medication." *Id.* at 596. Thus, the court held, relying on the corrective mitigating measures law set out in *Sutton v. United Airlines, Inc., supra,* and *Murphy v. United Parcel Service,* 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999):

Since plaintiff's asthma is correctable by medication and since she voluntarily refused the recommended medication, her

asthma did not substantially limit her in any major life activity. A plaintiff who does not avail herself of proper treatment is not a "qualified individual" under the ADA. *Roberts v. County of Fairfax, Va.,* 937 F.Supp. 541, 549 (E.D.Va. 1996). Since plaintiff has not on the record here presented proof that she has a disability as defined in the ADA, defendant is entitled to the entry of summary judgment in its favor as to all three counts of the complaint.

*Id.* The court noted in a footnote that the defendant also argued that the plaintiff has not shown that her ability to work is substantially limited by the effect which her asthma has on her major life activity of breathing. *Id.* at 596 n. 7, 119 S.Ct. 2133. The court determined that it was unnecessary to reach this argument as it was determined that the plaintiff did not have a disability. *Id.; see also Saunders v. Baltimore County,* 163 F.Supp.2d 564, 570 (D.Md.2001) (granting the defendant's motion to dismiss for failure to state a claim under the ADA in a case in which the plaintiff corrections officer suffered from asthma).

Defendant argues that the present case is similar to *Tangires* because Rose did not use his steroid nasal sprays as directed by his doctors. However, it is unclear from the record (and thus, assuming defendant has the risk of non-persuasion on this issue, the issue cannot be determined as a matter of law) whether Rose followed the proper usage of his steroid nasal spray, in this instance Vancenase.[6] Accordingly, I will assume that Rose properly used the

---

**6.** During his deposition Rose was asked whether he used his nasal sprays every day, "day in and day out for years." To which, he responded in the negative. *Rose Dep.* at 69. However, he did state that he used them as prescribed. *Id.* at 68. Rose explained that if the prescription "was to use to a complete empty bottle, then I used it to the complete

empty bottle ...." *Id.* The following colloquy also took place:

A. No, a lot of times when I would go in to see Dr. Schwartz and show him, especially here lately, he would write me a prescription for a bottle or two [ (referring to the nasal spray) ] because we were using just one pharmacy for all our medications and when you're somewhere else and you don't

nasal spray. What is evident, however, is that Rose did not follow the proper protocol in determining whether he had vasomotor rhinitis. Consequently, as a matter of law, he did not receive a proper treatment plan for his impairment. Rose's failure to take the proper measures to gain a proper diagnosis necessary to a proper treatment plan is the legal equivalent of a refusal to avail oneself of proper treatment. Therefore, Rose has not, on the record, presented proof that he has a disability as defined in the ADA. Defendant is thus entitled to the entry of summary judgment in its favor.

The medical evidence provided in this case shows that vasomotor rhinitis is a common, treatable condition. However, it is unclear whether Rose even suffered from this condition at all or solely. Dr. Gadde was unable to make a definitive diagnosis of vasomotor rhinitis. However, Rose told his family physician, Dr.

Schwartz of the preliminary diagnosis, and Dr. Schwartz apparently determined that the diagnosis "fit" without conducting any of the necessary tests himself. *Schwartz Dep.* at 31. As she testified, however, it was impossible for Dr. Gadde to make such a determination as long as Rose was suffering from a sinus infection. *Gadde Dep.* at 23. Thereafter, proper diagnosis would include a review of a CT scan to rule out the possibility of chronic sinusitis that would need to be treated with a longer course of antibiotics. *Id.* at 52–53. Once alternative causes were ruled out, Rose would have needed follow-up observation over an extended period of time to watch his symptoms after he had consistently followed a treatment regime involving both antihistamines/decongestants and, most importantly, daily use of steroid inhalers. *Id.* at 62. Rose would also have had to be examined after he had controlled what was the major cause of his symptoms-his smoking cigarettes.[7] *Id.* If Rose continued this

---

have your medication, you wouldn't travel to Europe and not take your drugs with you.

Q. And you say you'd go ahead and fill those prescriptions, typically?

A. Yeah.

Q. Would you then use them every day or just until the prescription, I'm talking just the nasal sprays, the Vancenase or the ...

A. No, I wouldn't use them every day. You can't use them every day, they're too rough on your sinuses.

*Id.* at 69. It appears that defendant takes this last statement to mean that Rose did not take the medication as directed but rather as needed. However, that result is not necessarily apparent when looking at the testimony. Defendant also cites to the following colloquy involving Rose's wife:

Q. Did he use the Vancenase on a regular basis?

A. Used it as he needed it, okay, buy it wasn't something he did daily. Okay?

Q. You say as needed. When he was having sinus problems or drainage -

A. Breathing problems.

Q. Breathing problems—he would then use the -

A. Hm-mmm. (Affirmative.)

Q. Vancenase—...

*Baker Dep.* at 51. Again, this testimony does not necessarily lead to the conclusion that Rose did not use his nasal spray as prescribed. According to the *Physician's Desk Reference*, patients should use Vancenase nasal spray only once a day daily at regular interval. PHYSICIAN'S DESK REFERENCE 3164 (56th ed.2002). "Improvement usually becomes apparent within 3 days after the start of therapy. However, 1 to 2 weeks may pass before full relief is obtained." *Id.* Moreover, the spray should not be used beyond 3 weeks "in the absence of significant symptom relief." *Id.* From the testimony, it is unclear whether Rose took the nasal spray accordingly.

7. In his affidavit, Rose attempts to explain away his smoking habit as an unavoidable condition, possibly even a disability. He states that he has an addictive smoking problem and has attempted to stop smoking by undergoing hypnosis, acupuncture, and using Wellbutrin and patches. *Rose's Aff.* ¶ 11. Rose claims that the Wellbutrin worked but its side effect was aggression so he ceased

treatment regime, and he was one of the small percentage of patients who continued having symptoms, there were surgical options available and the possibility that the headaches might have some other cause, such as migraines. *Id.* at 69–72.

Rose never returned to see Dr. Gadde and it appears that he did not fill the prescriptions she issued to him. Rose also failed or was unable to stop smoking. Moreover, assuming that Rose had availed himself of all of these mitigating measures, and that his diagnosis was correct, it is extremely unlikely that he would have continued to suffer severe headaches. As Dr. Gadde stated:

> [A] persistent headache is not usually a common problem associated with non-allergic rhinitis. It is a secondary problem. Nasal congestion is the primary symptom ... typically if the nasal congestion is controlled with nasal steroids, the not breathing, snoring, and the headache problem improves rapidly.

*Id.* at 64–65. When asked specifically about headaches interfering with sleep or thought processes, Dr. Gadde replied:

> I can't answer that question for you, because it is not something that I see with non-allergic rhinitis. I mean, a headache of that magnitude that's inter-

fering with sleep and not being able to think would have to be due to other reasons.

*Id.* at 69. Rose never attempts to respond to this extensive testimony from Dr. Gadde as to why she was unable to make a proper diagnosis after one visit.

Moreover, Dr. Schwartz's observations and conclusions regarding whether Rose had vasomotor rhinitis, the degree to which it was affecting his daily activities, and his recommendations that Rose leave the Washington, D.C., area, were based on misinformation. Dr. Schwartz may be a qualified family practitioner, but he was a general practitioner who was, at the time, two years out of his residency. *Schwartz Dep.* at 6. Dr. Schwartz assumed that there were no occupational factors that might be aggravating Rose's condition as Rose did not communicate to him that the working conditions on the overnight shift or the fact that these severe symptoms did not begin until Rose began that assignment. Further, Dr. Schwartz's opinion was influenced by Rose's description of the frequency with which he developed chronic sinusitis(*Schwartz Dep.* at 15–17, 26–27), but the medical records show only one other sinus infection between January 1996 and July 1999. *Def.'s Ex.* 5. Dr.

using it. *Id.* He also blames his "smoking addiction" on stress. He states "[w]hen I am undergoing periods of stress, I smoke more. In the past, I have smoked as few as 1/2 pack of cigarettes a day (without Wellbutrin). When I am undergoing stressful periods, I have smoked up to two packs of cigarettes a day." *Id.* ¶ 12. Regardless, the court in *Brashear v. Simms,* 138 F.Supp.2d 693 (D.Md. 2001), stated that a smoking addiction does not qualify as a disability under the ADA, but rather is remediable. The court stated:

> [C]ommon sense compels the conclusion that smoking, whether denominated as "nicotine addition" [sic] or not, is not a "disability" within the meaning of the ADA. Congress could not possibly have intended the absurd result of including smoking

within the definition of "disability," which would render somewhere between 25% and 30% of the American public disabled under federal law because they smoke. In any event, both smoking and "nicotine addition" [sic] are readily remediable, either by quitting smoking outright through an act of willpower (albeit easier for some than others), or by use of such items as nicotine patches or nicotine chewing gum. If the smokers' nicotine addiction is thus remediable, neither such addiction nor smoking itself qualifies as a disability within the coverage of the ADA, under well-settled Supreme Court precedent.

*Id.* at 695 (citing *Sutton v. United Airlines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)).

Schwartz agrees that there are medical treatments available for vasomotor rhinitis that could have been tried. He discussed the possibility of other medication to address his headaches, which Rose refused to consider. Dr. Schwartz also suggested that an ENT specialist review Rose's condition, which Rose declined. *Id.* at 25, 33. Rose has not attempted to address the misinformation and erroneous assumptions that formed the basis of Dr. Schwartz's "confirmed diagnosis."

Inexplicably, Rose relies heavily on the symptoms that he suffered in 1994 of migraine or migraine-like headaches to support his contention that he suffered from vasomotor rhinitis. *Rose's Opp.* at 10. In fact, however, this reliance only leads one to the conclusion that vasomotor rhinitis is not the sole cause of all of Rose's reported symptoms. Rose cites to the notes of Dr. Boetcher from September 1994 of "pain and double vision," *Def.'s Ex.* 5, and to the records of Dr. Mikszewski, a neurologist who saw Rose in the fall of 1994. *Id.* Dr. Mikszewski's initial diagnosis was that these headaches were likely related to sinusitis, but after seeing Rose over the course of several months, and hearing his description of his symptoms (e.g., that his headaches increased with stress), the neurologist's impression was migraine headaches. Rose stopped seeing Dr. Mikszewski, and did not follow his treatment recommendations because "he just didn't want to take the [injectable] medications that the doctor wanted him to take." *Baker Dep.* at 39.

It appears that Rose now alleges that he was mis-diagnosed by Dr. Mikszewski; he argues that all of his headache symptoms over the years can be attributed to vasomotor rhinitis. Rose has offered no competent medical evidence in support of this argument. Rather, he states that the debilitating headaches have been the "chronic manifestations of his underlying disability." *Rose's Opp.* at 9. However, the medical evidence in the record does not support this contention. As Dr. Gadde explained and as noted *supra*, the primary symptoms of all forms of rhinitis are nasal congestion, runny nose, sneezing and sinus pressure. *Gadde Dep.* at 34. Sinus pressure may be perceived as head pain, but severe headaches are not a common symptom unless a patient develops a sinus infection. *Id.* at 64–65, 60–72. Dr. Gadde was unequivocal in stating that of her thousands of patients, she has never seen a patient with non-allergic rhinitis that caused a headache so serious that it interfered with sleep or thought processes. If a patient had those symptoms, it "would have to be due to other reasons." *Id.* at 69. In other words, if Rose was suffering such headaches, and they continued after his sinus infection was controlled and he was being properly medicated for rhinitis, then it is more likely than not that they had some other medical cause, such as stress induced migraines, and have nothing to do with the air quality, humidity, or barometric pressure in the Washington, D.C., metropolitan area.

The episodes that Rose had in January and July 1999, while working on the overnight shift preparing for inventory, may well have been simply an adverse reaction to the site-specific working conditions and a change in his sleep patterns. No competent medical evidence is presented in the record from which it might be concluded that the episode of symptoms that began in mid-July 1999 was a manifestation of an underlying impairment of long-term or permanent duration.

Perhaps for obvious reasons, Rose does not explicitly address *Tangires*. Rather, Rose argues that he "only 'disregarded' advice or rejected a recommendation when it conflicted with another doctor's advice, or when the recommended action had al-

ready been tried." *Rose's Opp.* at 16. However, Dr. Gadde did not provide *conflicting* recommendations and any overlap in her recommendations with that of Dr. Schwartz's should have signaled to Rose (considering the high regard that Rose obviously has for Dr. Schwartz's medical opinion) the validity of Dr. Gadde's opinion and thus should have prompted him to return to Dr. Gadde. Moreover, Rose's actions are conflicting. He accepted the tentative diagnosis of vasomotor rhinitis provided by Dr. Gadde, but then rejected her advice and treatment plan, including smoking cessation. Rose also notes that he had already visited an ENT. *Id.* As noted *supra,* he visited an ENT for nose bleeds, not for vasomotor rhinitis.

Rose seeks to denigrate defendant's argument as an assertion that a person must exhaust surgical alternatives to be protected under the ADA. This is not remotely the case; rather, a consultation with another specialist to explore options and to receive a second opinion, *as Dr. Schwartz himself urged,* was a reasonable measure to take; the failure to take it was manifestly unreasonable.[8] Accordingly, the conclusion is inescapable that Rose has effectively avoided a reasonable opportunity to achieve mitigating diagnoses and treatments.

## C.

■ Even assuming, however, that Rose has rightly been diagnosed with vasomotor rhinitis as the sole cause of his ailments, and taking into consideration mitigating measures, Rose cannot establish that he was severely restricted in the major life activities of breathing, sleeping or working.

### 1.

First, there is no medical evidence or testimony that Rose was substantially limited in his breathing by vasomotor rhinitis or its characteristic manifestations. Rose testified definitively that his breathing was not impaired by his medical condition. *Rose Dep.* at 128. In his opposition, Rose concedes that "he has no particular difficulty with the act of breathing," but then cites to the records of Dr. Gadde as showing that Rose's small airways operated at reduced capacity. *Rose's Opp.* at 11. However, Rose neglects to mention the rest of Dr. Gadde's testimony regarding her test results. Dr. Gadde stated that Rose's "overall lung capacity was 83 percent, which is normal." The results regarding the small airways were characterized in her lab notes as "mild obstruction," and she testified that "this by itself is not diagnostic of anything," particularly as Rose has been "a longtime smoker." *Gadde Dep.* at 20–21; *Def.'s Ex.* 13. Any breathing difficulty Rose had could largely be explained by the fact that Rose was a heavy smoker. *Gadde Dep.* at 20–23. Moreover, the results of the breathing test, other than ruling out asthma, were meaningless as long as he still had an infection. *Id.* at 24. Therefore, the claim that Rose's breathing was substantially limited by vasomotor rhinitis is without any merit. *Cf. Mayers v. Washington Adventist Hosp.*, 131 F.Supp.2d 743, 749 (D.Md.2001) ("[T]he available evidence in-

8. This delving into the personal lifestyle choices of persons with physical and mental impairments appears to be a necessary evil of the ADA. The court is required to analyze personal medical decisions "because of the inconsistency of failing to protect a similarly situated plaintiff who is mitigating her impairment with medication, yet protecting a plaintiff who has decided not to mitigate her condition or has chosen to exacerbate her impairment through her choice of mitigation." Stephanie A. Fishman, Note, *Individuals with Disabilities but without Mitigating Measures*, 46 Wayne L. Rev.2013, 2039–40 (2000).

dicates that Plaintiff only experienced temporary difficulty in breathing when subject to the extreme environmental conditions allegedly found in her former workplace or seasonal changes. Under these circumstances, the Court concludes Plaintiff has not produced sufficient evidence to demonstrate that her asthma substantially limits her ability to breathe.").

### 2.

Second, Rose has failed to produce sufficient admissible evidence that he was substantially limited in his sleeping, and his allegations to that effect in his affidavit are not supported otherwise by the medical evidence in the record. Rose's claim that he was substantially limited in his sleeping is based almost entirely upon his affidavit. The only other record citation in Rose's opposition is to the testimony of Dr. Schwartz. *Rose's Opp.* at 11 (citing *Schwartz Dep.* at 37). That citation refers to Rose's July 30, 1999, visit, at which time Rose conveyed to Dr. Schwartz that he was unable to sleep at night and only slept twenty minutes a night. *Schwartz Dep.* at 37; 23–24. Rose has the burden of proving that his lack of sleep was significantly worse than that of the average person in the population as a result of a physical impairment, and that such condition was not transitory in nature. The only evidence that Rose has produced is in a single episode starting in mid-July 1999, lasting for less than a month, which may have been triggered by work-related conditions unique to inventory preparation at the Glen Burnie Home Depot store (*see infra*), and which was probably caused in part by changes in his sleep patterns related to working an overnight shift. Clearly, this instance is insufficient to meet the threshold of having a permanent or long-term impact on Rose's ability to sleep.

In his affidavit Rose states:

At first my headaches would occur about 1 or 2 times a week. By July of 1999, my headaches were almost constant. I could not sleep or think. I was only able to sleep intermittently throughout the night, perhaps getting two or three hours of sleep a night. *This went on for periods of several months.* Frequently I would be unable to sleep at all or for only fifteen to twenty minutes at night.

*Rose Aff.* ¶ 7 (emphasis added). Assuming that "this" in the above italicized sentence is referring to his sleeping problem, it is only in his affidavit that Rose claims he had sleeping problems for periods of several months and that he would only sleep two or three hours a night. This assertion is not otherwise supported by the record. This conclusory assertion does not create a factual dispute. The Fourth Circuit has explained that in opposing a motion for summary judgment

the nonmoving party must produce "specific facts showing that there is a genuine issue for trial," rather than resting upon bald assertions of his pleadings. . . . Genuineness [ (a requisite inquiry when considering a motion for summary judgment) ] means that evidence must create a fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds would recognize as real factual disputes.

*Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985) (citations omitted); *see also Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. . . . Unsupported speculation is not sufficient to defeat a summary judgment motion." (internal quotation marks omitted) (citations omitted)); *id.* ("Recent cases of the Supreme Court have made increasingly clear, however, the affirmative obligation of the trial judge to prevent 'factually unsupported claims and

defenses' from proceeding to trial." (quoting *Williams,* 317 U.S. at 324, 63 S.Ct. 207)).

Rose began working the night shift on July 5, 1999, and he saw Dr. Gadde on July 21, 1999. *Def.'s Ex.* 36. Therefore, the onset of his severe symptoms started sometime around July 10–14, 1999, less than three weeks before he saw Dr. Schwartz. It was at this time that Rose related to Dr. Schwartz that he was having trouble sleeping and only slept *twenty minutes* a night, *supra.* Rose did not tell Dr. Schwartz that he had changed his sleep patterns between July 5 and July 14. Moreover, Rose's wife testified that Rose always had trouble sleeping during the day, and during prior inventory preparation. *Baker Dep.* at 67–68. When asked directly regarding his symptoms during his deposition, Rose failed to mention inability to sleep as a symptom. For instance, the following colloquy took place on deposition:

> Q. When you were having the headaches, the very severe headaches, what affect did that have on your day-to-day life, what you were able to do and what you couldn't?
>
> A. It made me extremely irritable, it was hard to function.

*Rose Dep.* at 128–29.

Furthermore, in his affidavit, *supra,* Rose claims that he was unable to sleep for several months beginning in July 1999, this scenario is simply untenable. Rose left for West Virginia after July 30, 1999, and he reported to Dr. Schwartz a month later that he had been "doing fine." *Rose Dep.* at 79. From his affidavit, it is unclear whether he is referring to the July 1999 period or to some other period, how many night's sleep may have been affected by headaches, and how his sleep problem may have been related to the change in Rose's sleep patterns. The Fourth Circuit has stated that "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 198 (4th Cir. 1997) (alteration in original) (internal quotation marks omitted) (quoting *Barwick v. Celotex Corp.,* 736 F.2d 946, 960 (4th Cir. 1984)); *see Rohrbough v. Wyeth Labs., Inc.,* 916 F.2d 970, 975–76 (4th Cir.1990) ("Given the conflicts between Dr. Cox's affidavit and his deposition testimony, the district court was left not with a genuine issue of material fact, but with trying to determine which of several conflicting versions of Dr. Cox's testimony was correct." (citation omitted)). "The reason for this rule is simple: 'If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" *Halperin,* 128 F.3d at 198 (quoting *Celotex Corp.,* 736 F.2d at 960).

Though he never testified at deposition that he did not have sleeping problems, he did provide conflicting testimony, as he never claimed sleeping difficulty as a symptom or consequence of his ailment. Therefore, it seems clear that Rose had some sleep problems lasting approximately some time less than three weeks, and starting after his change in shift in July 1999. That period of time is far too short a period to establish a substantial limitation on the major life activity of sleeping. Rose had not been substantially limited in sleeping prior to the commencement of the overnight shift, and there is no evidence that the pattern would likely have continued after he resumed the day shift in August. *Cf. Steele v. Thiokol Corp.,* 241 F.3d 1248, 1254 (10th Cir.2001) (determining that the plaintiff's physical impairment did not substantially limit his ability to

sleep as the only evidence presented was that he was often awake in the middle of the night and so he was fatigued during the day); *Pack v. Kmart Corp.*, 166 F.3d 1300, 1306 (10th Cir.) (concluding that the plaintiff's physical impairment did not substantially limit her ability to sleep because "there [was] no indication that her sleep problems were severe, long term, or had a permanent impact" although there was evidence the plaintiff "had episodes of sleep disruption and/or waking without feeling rested"), *cert. denied*, 528 U.S. 811, 120 S.Ct. 45, 145 L.Ed.2d 40 (1999); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 644 (2d Cir.1998) (holding that the plaintiffs were unable to demonstrate that their sleep had been substantially limited), *cert. denied*, 526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999).

### 3.

Finally, Rose cannot meet his burden of showing that he was substantially limited in the major life activity of working. The Supreme Court has explained that

> [t]o be substantially limited in the major life activity of working, ... one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Sutton*, 527 U.S. at 492, 119 S.Ct. 2139. The Fourth Circuit has similarly stated that a plaintiff "had to show not merely that her allergy made her 'incapable of satisfying the singular demands of a particular job,' ... but that it 'foreclosed generally [her opportunity to obtain] the type of employment involved' ...." *Gupton v. Commonwealth of Virginia*, 14 F.3d 203, 205 (4th Cir.) (citations omitted) (second alteration in original), *cert. denied*, 513 U.S. 810, 115 S.Ct. 59, 130 L.Ed.2d 17 (1994). More recently, the Fourth Circuit affirmed the grant of summary judgment for an employer where a plaintiff proved only that she was "unable to function in one particular smoke-infested office" and was not generally foreclosed from jobs utilizing her skills. *Rhoads v. Federal Deposit Ins.*, 257 F.3d 373, 388 (4th Cir.2001); *see Mayers*, 131 F.Supp.2d at 749.

Rose argues, without further elaboration, that he "is able to show that he is precluded from all jobs because, without accommodation, he is virtually precluded from all jobs in the metropolitan area" and "is also limited from a whole class of jobs in the building trades because the environmental factors, absent an accommodation, aggravate his impairment." *Rose's Opp.* at 11. It is not clear what Rose means by this latter argument involving "environmental factors." If Rose was having problems because of a unique work-site condition, then he does not suffer from a disability as defined by the ADA. *Cf. Rhoads*, 257 F.3d at 388 ("We must accordingly agree with the district court that Rhoads has failed to make a sufficient showing that she was substantially limited in her ability to work, where she has established only that she was unable to function in one particular smoke-infested office."). The evidence is clear that Rose was only limited when working in the particular conditions that existed during the overnight shift while preparing for inventory. Rose's vasomotor rhinitis did not have any affect on his ability to work at Home Depot prior to that time. Moreover, even throughout the period of his most bothersome symptoms in July 1999, before Rose sought medical treatment, he continued to go to work.

However, Rose also makes the remarkable contention that he cannot live or work anywhere in the Washington, D.C., or Bal-

timore metropolitan area, in any type of job, regardless of the environmental conditions of his work place, and as such he is substantially limited in his major life activity of working. There is no medical evidence in the record to support his claim besides his own subjective belief. Rose has made the extraordinary leap from his being able to work in a hot, dusty un-air-conditioned environment at one store, albeit with periodic headaches, to a conclusion that he could not work at any jobs or even to continue to live in the metropolitan area. Dr. Schwartz testified that Rose wanted to move, and that if Rose had not wanted to move, Dr. Schwartz would have tried to convince Rose to consider alternative treatments such as going to see an ENT. *Schwartz Dep.* at 49. Dr. Gadde and Dr. Schwartz both agree that Rose could have first tried other changes in the workplace or work environment to see if that affected his symptoms. *Gadde Dep.* at 58–59; *Schwartz Dep.* at 49–50. However, Dr. Schwartz admits communicating to Rose that if he had exhausted (or in this case rejected) all other medical options, Rose should "move out of this climate." *Schwartz Dep.* At 50. Such an opinion by a family practitioner two years out of his residency, based upon significant misinformation, *supra*, is insufficient to meet the plaintiff's burden of proving that he was unable to work at any position in the Baltimore–Washington area.

Furthermore, as a matter of epidemiological fact, it is highly unlikely that a patient with vasomotor rhinitis would be unable to continue living in the Baltimore–Washington area. *Gadde Dep.* at 56–57. Dr. Schwartz speculated that the reason that Rose felt relieved of symptoms in a more mountainous climate may have been changes in the temperature and barometric pressure. Rose claims that he does not have any of the symptoms when he visits Winchester, Virginia (which is close to Maysville, West Virginia and is the loca-

tion of the closest Home Depot store to Maysville, *Rose Dep.* at 23–25), but starts suffering symptoms as soon as he approaches Manassas, Virginia, outside Washington, D.C. *Id.* at 7–9. Glen Burnie, in Anne Arundel County, Maryland, is 184 feet above sea level, Manassas is at 322 feet, and Winchester is 554 feet. *Def's Ex.* 34. Rose has not provided any admissible expert evidence that this seemingly insignificant change in altitude is sufficient to explain any ostensible change in his symptoms. If high heat and humidity are adverse factors, *Schwartz Dep.* at 30–31, then in the summer of 1999, Rose's symptoms should have been less in Glen Burnie as in the summer of 1999, the average monthly temperature in Glen Burnie was significantly less than that in either Winchester or Maysville, and Glen Burnie received significantly less rainfall. *Def.'s Ex.* 34 (Statistics from http://www.accuweather.com).

Rose calls this evidence "simplistic" and claims that for him "the medical benefit of living in Maysville is the compound effect of air quality, barometric pressure and humidity." *Rose's Opp.* at 15 (citing *Schwartz Dep.* at 32–33). This claim is speculative and is unsupported by the record. In particular, the portion of Dr. Schwartz's deposition cited for support does not provide any support for the assertion. Dr. Schwartz testified:

> Changing environment is often useful and eliminating the offending causes. So regulating the patient's, again, environment, whether that's humidity, temperature, barometric pressure, or other environmental irritants. In some cases, it's cigarette smoke.

*Schwartz Dep.* at 32–33. Dr. Schwartz did not attempt to distinguish among these possible factors because Rose made it clear that his symptoms had a seasonal pattern that were worse over the summer

months, and that Rose intended to be in West Virginia two to three months a year and then return for the remaining portion of the year. *Id.* at 39. Dr. Schwartz's relatively uninformed advice, based upon erroneous assumptions, was that Rose should seek out a mountainous environment. His opinion is no more probative as medical evidence than the perception of Rose's wife that the reason Rose felt better after getting away to the mountains for several days was that he was able to relax from work. *Baker Dep.* at 85–87.

Of course, in any event, it is not defendant's burden to prove that there are no environmental factors that contributed to Rose's perception that he had fewer symptoms when he went to Maysville, West Virginia. Rather, Rose has the burden of proving that a relocation to a more mountainous environment was medically necessary as the only way that he could continue working. This is a burden that Rose has not met.

Moreover, the record shows, indisputably, that Rose has not been free of symptoms since moving to Maysville. He gets headaches while cutting grass which lasts for several hours after he stops cutting grass. *Rose Dep.* at 9–10; *Baker Dep.* at 109. His wife has observed him get headaches during her weekend visits to Maysville, and on a trip they took to visit family in Suburban Ohio. *Baker Dep.* at 106–11; *see Rose Dep.* at 13, 15. He has also had to take over-the-counter sinus medication. *Baker Dep.* at 106–11. Severe headaches were one of the symptoms that led Rose to go to several hospitals in early February 2000. *Def.'s Ex.* 21 (Medical Records of Dr. Norman Luban). On March 2, 2000, Rose went to Dr. Boetcher's office to have FMLA paperwork filled out and to receive treatment for sinus and ear infection. *David Dep.* at 11, 15–17.

Furthermore, although Rose has seen several physicians in the Washington, D. C., metropolitan area since August 1999, their records do not show that Rose suffered the severe symptoms that he claims he experiences within hours of his return to this area. Rose saw Dr. Luban, a neurologist in the Washington, D.C. area, on February 9 and March 8, 2000. *Def.'s Ex.* 21. It was Dr. Luban's conclusion that his symptoms were stress related. *Id.* Rose did not mention congestion or other related symptoms on those visits. *Id.* Rose also saw Dr. Thomas, a rheumatologist, on February 21, 2000, in Greenbelt, Maryland. The physical examination did not indicate any sinus or nasal problems, but Rose did report to Dr. Thomas that he suffers from sinusitis. *Def.'s Ex.* 22 (Medical Records of Dr. Donald E. Thomas). When Rose saw Dr. David on March 2, 2000, he did not report severe disabling headaches, but he did have sinusitis. *David Dep.* at 15–16, 22–23. When Rose saw Dr. Schwartz on August 10, 2000, to retain a leave of absence slip to cover the period from September 1, 1999 to September 1, 2000, Dr. Schwartz saw some nasal congestion, but no significant post-nasal drip, no sign of infection, and Rose did not complain that he was suffering severe headaches. *Schwartz Dep.* at 52–551 Ex. 5, at 23. Rose, however, complained of bad sinus congestion after being back in the area for five days. *Schwartz Dep.* at 53.

The record simply leaves no room to doubt whether Rose was substantially limited in working; he was not. Specifically, Rose has not demonstrated that his condition prevents him or severely restricts him from working, particularly in the Baltimore/Washington, D.C., area. Though the condition of vasomotor rhinitis may be permanent, he has not established that the *impact* of vasomotor rhinitis is permanent or long-term. Further, Rose has not shown that the intermittent manifestations of his impairment substantially limit his ability work. Rather, he has described one instance of extreme symptoms, which,

on the present record, was more likely than not induced by work environment conditions.

It is evident, therefore, that Rose does not suffer from a disability as defined by the ADA. Accordingly, I need not discuss further Rose's claim that defendant failed to accommodate him. (Rose for the first time in his opposition memorandum argues a claim of retaliation. *Rose Opp.* at 13–14. The complaint does not contain a claim of retaliation. Rose has not sought leave to amend his complaint to add the claim of retaliation. The inclusion of an argument articulating such a claim in an opposition to a motion for summary judgment is not to be treated as motion for leave to amend under Fed.R.Civ.P. 15(a). Accordingly, Rose's claim for retaliation is disregarded.)

## IV.

The motion for summary judgment shall be granted. An order follows.